Greer v. Lafayette County Bank.

GREER v. LAFAYETTE COUNTY BANK *et al.*, *Appellants.*

Division Two, May 21, 1895.

1. **Sale:** PERSONAL PROPERTY. A sale of personal property at common law could not be effected without a proper subject of sale, a price and the consent of the contracting parties; where any one of these necessary elements was lacking, there could be no sale.

2. ——: ——: PLEDGE. Where bank stock was pledged as collateral security for a note given a bank and the note and collateral were sold by the pledgee to another bank which afterward transferred it to the president of the pledgee bank upon his direction, without any mutual agreement to that effect and without any price having been agreed upon, such transfer does not constitute a sale and the title of the pledged stock remained as before such attempted transfer.

3. **Note:** TIME OF PAYMENT, EXTENSION OF. A note payable in three months will become payable on demand by the acceptance by the payee of payments of interest and portions of the principal from time to time for a period of years.

4. **Loan Payable on Demand:** PLEDGE: SALE: NOTICE: CONVERSION. A sale of collaterals held for a loan payable on demand, without notice to or demand of the pledgor, is invalid and may, at the option of the latter, be affirmed or treated as a conversion.

5. **Pledge:** SALE: NOTICE: AGENT: REDEMPTION. The pledgee must, as a general rule, give reasonable notice to the pledgor of his intention to sell and he can not buy at the sale, whether made by himself or his agent or broker. A sale without notice or at which the pledgee purchases is a breach of the contract of pledge and the pledgor may treat such sale and purchase as a conversion and will be entitled to redeem on payment or tender of the principal debt.

6. **Principal and Agent:** FRAUDULENT ACTS OF AGENT. A principal is bound by the acts of his accredited agent, done in the course of his employment, even though they be of a fraudulent character.

7. **Stock, Value of:** EVIDENCE. In the absence of evidence of the market value of stock, its value may be established by showing its dividend earning capacity.

**8. Appellate Practice:** VERDICT: ERRONEOUS INSTRUCTION. Where a verdict is the only one that could properly have been rendered on the evidence, it will not be disturbed because of the giving of an erroneous instruction.

*Appeal from Ray Circuit Court.*—HON. E. J. BROADDUS, Judge.

AFFIRMED.

Action by plaintiff for damages because of the fraudulent conversion by defendants of twenty shares of stock in the State National Bank of El Paso, Texas, of the face value of $100 each. The record discloses that: In 1881 plaintiff became the owner of twenty shares of the capital stock of the State National Bank of El Paso, Texas. The stock of this bank was $55,000 fully paid up, as required by the act of congress; there was $35,000 surplus fund, $12,906 undivided profits. In addition to the accumulation of this $35,000 and of $12,906, the stock had paid an annual interest of $240, or twelve per cent.

In the latter part of March, 1888, Robert Greer applied to George Wilson, as president of the defendant bank, for a loan of $1,500 for his wife, offering as collateral the twenty shares aforesaid, which Wilson, by correspondence with the First National Bank of El Paso, ascertained to be ample security for the loan. Greer testifies that when the loan was made, that is, April 21, 1888, it was distinctly understood between Wilson and himself that, though the note was drawn payable in three months, yet so long as "we kept the interest paid it would be satisfactory;" that Wilson said: "Just run it as long as you need it, so you keep the interest up, the collateral is good enough for me."

On the date last mentioned, plaintiff borrowed of the defendant bank $1,500, for which she and her hus-

band executed their note payable three months after date, with interest after date at eight per cent., by which she also hypothecated, as security, these twenty shares of stock in the State National Bank of El Paso, Texas, authorizing their sale in case of nonpayment, without notice, at public or private sale; providing further, that said bank on payment of the amount loaned, as specified therein, and at any time before said collateral security shall have been sold, to surrender the same. At different times plaintiff paid the interest upon the note and part of the principal, but the defendants insisted on continuing the loan, as it was well secured, and the evidence shows that plaintiff could have procured the money at any time on the collateral for that purpose, also letters of defendants acknowledging partial payment. *No demand or request for payment was ever made.* The only thing testified to by Wilson was that, on some of these partial payments being made, the note was laid down on the counter and which he states he regarded as a "*demand*," but the evidence on the contrary is clear that from time to time the loan, by the assent and agreement of the parties, was extended.

January 5, 1892, plaintiff notified the defendants by letter that she did not desire to continue the loan longer, and to send the note and stock to the Aullville Bank for payment. In answer to this request, she received from defendant Wilson a letter, dated the sixth of that month, which was the first intimation she had received of the alleged sale of her stock and its purchase by defendant Wilson. In this communication he stated: "The Lafayette County Bank some time ago found it had too much loaned out and sold off some of its outside paper (by outside we mean the notes of persons who do not keep a regular and constant deposit with us). The note of Kittie J. Greer and R. L. Greer,

VOL. 128—36

along with other paper, was sold in St. Louis. The purchaser afterward wanted the bank to buy back your note; but as the bank has entered on a policy of lending only to those who keep good deposits with us, it did not suit the bank to do this. I arranged the matter by buying for myself the stock, which had gone along with the note when it was sold. The stock thus became my property. * * * I call your attention to the laws of this state as to debts owed to bankers. If a banker can not pay his depositors what is owing to them, he stands in the law on the same footing as if he had stolen that much money and must go to prison, but if any one else owes the banker he can quietly tell the banker that he is not able to pay and there is an end to it. This being the case I ask you to put yourself in my place and say if you would miss a chance to get back a thousand or so out of any member of a family, if the rest were owing you nearly $5,000. * * * But in the purchase of this stock I have acted strictly according to law and the contract and under the best legal advice at every step and the result can not now be changed."

On May 21, 1891, Wilson, as president of the defendant bank, began a correspondence with the Franklin Bank of St. Louis. These banks had long been doing business with each other. The correspondence and its incidents, as shown by the deposition of Garrels, the cashier, taken in narrative form, are as follows:

" 'LEXINGTON, MISSOURI, May 20, 1891.

" '*Franklin Bank, St. Louis:*

" 'We wish to use some money on outside discounts; I prefer to sell them outright and will make you a separate and formal bond or guarantee that we will pay them in four months if the makers do not. Our reason for this is that they need not then appear

as rediscount in our statement to the secretary of state. If this suits you, place the proceeds to our credit. Number 2963 is on sixty-five acres of land two miles from town, worth only, say, fifty per cent. over the note. We expect to get par and interest for it, and the value of the number 2963 balance and interest on it. Does this suit you? Respectfully,

"(Signed) 'G. WILSON, President.'

"Accompanying this letter was plaintiff's note for $1,500, which had indorsed thereon, the authority to sell the stock heretofore mentioned, without notice, at public or private sale, etc. On the back of said note the following credits appear:

" 'February 5, 1889. Interest paid to date ($95) and $105 paid on principal.'

" 'Paid $25 interest to April 26, 1889 (on June 22, 1889).'

" 'July 17, 1889. Paid interest to July 16, 1889 ($25) and $95 on principal.'

" 'March 3, 1890. Paid interest to date and $55 on principal. (Interest $65). Leaving balance $1,245.'

" 'July 18, 1890. Paid interest to date and $87.65 on principal. Balance $1,157.35 due.'

" 'January 15, 1891. Interest $49.25 paid to date, and $74.25 paid on principal. (Paid by draft on St. Louis.) $1,083 balance due.'

" 'Pay Franklin Bank or order.

" 'LAFAYETTE COUNTY BANK.

" 'Pr. GEO. WILSON, President.'

"The further indorsements appear on the back of the note:

" 'Paid on this note July 21, 1891, $1,118, by sale of twenty shares stock mentioned therein.'

" 'Pay Lafayette County Bank or order without recourse. FRANKLIN BANK.'

"This letter offered to us for sale two pieces of negotiable paper, number 2963, being the collateral note of Kittie J. Greer and R. L. Greer to which I have referred marked 'Exhibit A'; the other item, mentioned as number 2900, was a real estate note secured by deed of trust. We received these securities at the same time we received the letter 'Exhibit B.' We bought them on the terms stated in 'Exhibit B,' and credited the account of the Lafayette County Bank therefor in certain amounts stated in my letter to Geo. Wilson, president, of date May 23, 1891, of which letter I produce a letter press copy and the same is hereto attached:

"'*Geo. Wilson, Esq., Pr., Lexington, Mo.*

"'DEAR SIR:—We would have preferred to discount your note with paper sent as collaterals, but as you wished it, shall comply with your request. We shall credit the note at face and accrued interest and instruct our attorney to draw up a paper to cover the case which we shall mail to you for your signature as soon as received.          Yours Truly,

"(Signed)          'G. W. GARRELS.

"'To your credit.

"'$1,083.10.      4m, 8d, 30-80.      $1,112.90.

"'$2,084.63.      10m, 5d, 140-82.      $2,225.45.'

"The bank held this note until the interest on the real estate note of a Mr. Francisco became due and then we wrote to Francisco that we would foreclose on the land unless the interest was paid. Thereupon Mr. Francisco arranged with the Morrison-Wentworth bank to take up that real estate note, which bank paid us principal and interest, whereupon we turned that real estate paper over to it—that ended our connection with security number 2900, in the letter 'Exhibit B.' The collateral note of the Greers was still in the possession of the Franklin Bank, but about the same time with

my letter to Francisco I wrote to the Lafayette County Bank a letter July 18, 1891, a letter press copy of which I produce and which is hereto attached:

"'July 18.
"'*Geo. Wilson, Esq., Pr., Lexington, Mo.*

"'DEAR SIR:—What action do you wish us to take in regard to the papers we bought from you?
"'Yours truly,
"'G. W. GARRELS.'

"In which we inquired what action we were to take in regard to the securities we bought as above stated.   Thereupon we received a letter from the Lafayette County Bank dated July 24, 1891, which I now produce and which is hereto attached.

"'LEXINGTON, Mo., July 24, 1891.
"'*Franklin Bank, St. Louis, Mo.*

"'GENTLEMEN:—I saw H. C. Francisco last night, and he says that he will arrange to get the money to pay off that note and asks me to have it sent here and indorse it over to the person who is going to furnish him the money.   I told him that could not be done; that he would have to make an entirely new loan and this be put on the record satisfied.   I suppose he can do this just as well if he can get the money at all.   I will write again as soon as I see him again.
"'Yours respectfully,
"'R. A. WILSON, Cashier.'

"This letter is an answer to our inquiry in so far as the Francisco note was concerned.   In regard to the Greer collateral note, the Lafayette County Bank replied to our inquiry in a letter dated July 20, 1891, which I now produce and which is hereto attached:

" 'LEXINGTON, Mo., July 20, 1891.
" '*Franklin Bank, St. Louis.*

" 'Ans'g yours of 7–18 make a draft on Geo. Wilson for within $10.00, the amount due on the note secured by National Bank stock and attach the certificates of stock to draft and charge to our account and send to us for collection. Also send a notice to H. C. Francisco, Lexington, Mo., stating that you are the owner of his note and wish same paid at once or you will advertise and sell the land forthwith.

" 'Respectfully,

" 'GEO. WILSON, President.'

"In pursuance to that letter we drew a draft on Geo. Wilson for $1,118 and attached thereto the certificate number 21 for twenty shares of the capital stock of the State National Bank of El Paso, Texas, being the certificate of stock mentioned in the Greer collateral note. I now produce the said draft and attach the same hereto:

" '$1,118.                    ST. LOUIS, July 21, 1891.

" 'Pay to the order of ourselves eleven hundred and eighteen dollars. To Geo. Wilson, Esq., Lexington, Mo.                    FRANKLIN BANK,

" 'By G. W. Garrels, Cashier.'

"On the back of said draft appears the following:

" 'Pay Robt. A. Wilson, Esq., cash or order for collection.

" 'G. W. Garrels, Cashier.'

"This draft was sent to the Lafayette County Bank accompanied by two letters to R. A. Wilson, cashier, dated July 21, 1891, of which letters I now produce letter press copies which are hereto attached:

" 'July 21.

" '*Robt. A. Wilson, Cashier, Lexington, Mo.*

" 'DEAR SIR:—Please find enclosed for collection draft on Geo. Wilson for $1,118 attached thereto. Note

of Kittie J. Greer and R. L. Greer, $1,500, twenty shares State National Bank El Paso.

     "'Yours truly,       G. W. GARRELS,
                     "'Cashier.'
                     "'July 21.

"'*R. A. Wilson, Cashier, Lexington, Mo.*

    "'DEAR SIR: Your favor of the 20th inst. received. We credit $2,500 and charge Geo. Wilson 1120. The other party has due notice.

     "'Yours truly,       G. W. GARRELS,
                     "'Cashier.'"

The witness, Cashier Garrels, also testified that pursuant to instructions given by the Lafayette County Bank, he sold the stock of plaintiff to Geo. Wilson at private sale for $1,118.

The "formal bond" offered to be given by Geo. Wilson as president of the defendant bank was executed in accordance with the previous proffer made. Among other provisions this bond contains, is the following: "And whereas, in consideration of said purchase, said Lafayette County Bank has agreed with said Franklin Bank, in the event said notes, or either of them, be not paid within four months from May 20, 1891, that then said Lafayette County Bank would buy them back from said Franklin Bank."

No notice whatever was given to plaintiff of the transfer to the Franklin Bank, nor did that bank ever request payment from her. On learning by the letter of Wilson, January 6, 1892, of the pretended sale, plaintiff came to Lexington, and made tender in gold of the amount due upon the note, when defendant Wilson claimed that he did not have the note or collateral. She then commenced this suit.

The answer sets forth the execution of the Greer note, the power of sale contained therein, the deposit of the collateral; it then alleges that they failed and

neglected to comply with the terms of the said note, and to pay the same when due, although defendant has demanded payment for the space of three years. The answer then alleges that there had been paid on the note $710, leaving unpaid $1,106.23; that for the purpose of collecting and paying the said sum of $1,106.23 so due as a balance on said note, it indorsed and sold said note, and contracted and delivered said bank stock, the collateral security, to the Franklin Bank in St. Louis, according to the terms of said contract and note; that said bank afterward sold the same to George Wilson for $1,118.

The replication denies specifically the averments of the answer and charges that the pretended sale and purchase were merely colorable, pretended, fictitious and fraudulent, for the purpose of depriving plaintiff of her property, and cheating and swindling her. It then proceeds and sets forth the borrowing of the money, the execution of the note, the depositing of the collateral, and the power of sale, and further avers that on the note becoming due she paid the interest, the defendant bank insisted on continuing the loan and it was agreed to be continued.. That from time she paid the interest on the note, reducing principal and interest to about $1,000; that on several occasions she offered to pay the note; that the defendant bank and defendant Wilson insisted on her keeping the money, which she now believes was but a scheme to defraud her out of said collateral security. That defendants, for the purpose of cheating and defrauding her, pretended to hypothecate said stock with the Franklin Bank; that afterward the defendant Wilson, for the purpose of cheating and defrauding plaintiff, ordered and directed the Franklin Bank to transfer the said collateral to him, and to draw upon George Wilson for $1,118, which was also a part of the defendants' scheme of cheating her.

That the Franklin Bank did not exercise any of the powers of sale contained in the contract, nor did it or its officers exercise any discretion, but simply followed the directions of defendant Wilson, and that in fact the debt due from the Lafayette County Bank to the Franklin Bank, for which the note and collateral of plaintiff was alleged to be held by the Franklin Bank as security, was not in fact due. That the alleged transfers were fraudulent and concocted to defraud plaintiff.

Under the instructions and evidence in the cause, the jury found the issues for the plaintiff and returned a verdict in her favor for $3,000, hence this appeal.

*William Aull, B. Wells* and *Alexander Graves* for appellants.

(1) There is not a single fact or circumstance indicating fraud or conspiracy between the banks or either of them, with the purchaser of the stock certificate. Where a transaction is as well compatible with honesty as with dishonesty, it will be presumed to be the former and not the latter. *Chapman v. McIlwrath*, 77 Mo. 44; *Dallam v. Renshaw*, 26 Mo. 533; *Baytham v. Agnew*, 70 Mo. 48; *Pomeroy v. Benton*, 77 Mo. 64. The Lafayette County Bank had the right to sell the Greer note to the Franklin Bank and the indorsement thereof for value and the delivery of the same, together with the certificate of stock indorsed in blank, carried the title and invested the Franklin Bank with all the powers to sell said pledge, the stock certificate, that the Lafayette County Bank had; and when the Franklin Bank sold said stock certificate to George Wilson and credited the amount of the proceeds upon the Greer note, the title passed to said Wilson. *Johnson v. Laflin*, 103 U. S. 803; *National Bank v. Bank*, 105 U. S. 820; *Bank v. Durfee*, 118 Mo. 443; Colebrooke on

Collateral Secur., secs. 269, 271, 319, 321; *Lanier v. McIntosh*, 117 Mo. 516; *Watson v. Hawkins*, 60 Mo. 554; *Pickett v. Jones*, 63 Mo. 199. The doctrine is well established in this state that the indorsee for value of a negotiable note secured by mortgage takes the security by the same title that he takes the note. *Joerdens v. Schrimps*, 77 Mo. 385. And if the security consists of a chattel, the assignee of the debt secured may maintain replevin without assignment of the chattel mortgage. *Kingsland v. Chrisman*, 28 Mo. App. 314. (2) The sale of the collateral security, the stock certificate, by the Franklin Bank to George Wilson, passed a valid title without notice to Greer, because such was the stipulation contained in the note whereby such stock was hypothecated and because the stock was at the time of such hypothecation transferred by indorsing the blank power of attorney. *Chouteau v. Allen*, 70 Mo. 330; Colebrooke on Col. Secur., secs. 118, 122, 328, 329, 334; *Union Trust Co. v. Rigdon*, 93 Ill. 458. The Franklin Bank was not required to watch the stock market for the purpose of finding the most favorable moment to sell. *Whinten v. Paul*, 13 R. I. 40; *Dunnett v. Einstein*, 35 How. Pr. 223; Colebrooke on Col. Secur., sec. 329. When George Wilson's interests and those of the bank of which he is president conflict, then his interests must give way to those of the bank. But when they do not conflict, when the bank needed the money instead of the Greer note, then Wilson as an individual had the right to buy in the Greer note when offered for sale by the Franklin Bank. As a corollary from the foregoing, George Wilson, the purchaser, under all circumstances obtained a good title when the Franklin Bank sold said stock for $1,118, and applied same to payment of the note secured thereby. *Funkhouser v. Lay*, 78 Mo. 465; *Craig v. Zimmerman*, 87 Mo. 478; Story's Eq. Jur., sec. 429. The fact that Kittie

J. Greer was a married woman is wholly immaterial. Colebrooke on Col. Secur., secs. 305, 328; *Dando's Appeal*, 94 Pa. St. 76; R. S., secs. 6864, 6869; *Brown v. Bowen*, 90 Mo. 185; *Daily v. Co.*, 88 Mo. 301; *Blair v. Railroad*, 89 Mo. 383. (3) The tender of the debt due from the Greers evidenced by their note and secured by the stock certificate, after the transfer of the note and the sale of the stock by the Franklin Bank, according to the terms of said collateral note, in no wise affected the title of Wilson, who became the purchaser. Colebrooke, *supra*, sec. 122; *Loomis v. Staver*, 75 Ill. 623.

*John Welborn* for respondent.

(1) It is elementary in determining the legal effect of a written instrument, or of a transaction like the present, all contemporaneous writings relating thereto must be looked into and construed as one. *Noell v. Gains*, 68 Mo. 652, 653, and cases cited. The alleged transfer of the note of plaintiff must be looked at, therefore, in connection with the bond or obligation of the Lafayette County Bank to the Franklin Bank. So viewed, the transaction was not a negotiation of the note of plaintiff for value; it was by its legal effect a mere pledge thereof with the collateral to the Franklin Bank, with an agreement by the Lafayette County Bank to redeem the note and stock in four months if not paid. (2) The power contained in the Greer note gave the authority of sale in case of default, but this power will be strictly construed and did not give the right to the Lafayette County Bank to pledge the stock to raise money for its own accommodation. *Price v. Courtney*, 87 Mo. 387, and authorities cited on page 393; 1 Sugden on Powers [Ed. 1856], 513; 2 Perry on Trusts, sec. 768. This is held even in cases where the

power of sale is for the benefit of the grantor or vendor; for stronger reasons is there no power to pledge the security for the pledgor's own benefit, where he merely holds the security himself as collateral for a debt due him. (3) Fraud was conclusively shown by the evidence. See *Dobson v. Racry*, 3 Sandf. Ch. (N. Y.) 60. The purchase by Wilson was fraudulent and was a conversion as well as was the original act of pledging the stock to the Franklin Bank. *Saberty v. Snathen*, 68 N. Y. 522. (4) There was evidence of the value of the stock. It was paid up in full, the surplus was $35,000, undivided profits $12,906, on a capital of $55,000; in addition it had paid twelve and one half per cent. dividend annually. This is one mode of fixing in the market such values. There being no sale, this alone was a sufficient basis of value. Besides, that part of the deposition of Morehead, president of the El Paso Bank, and evidence of Hughes, excluded on objection of defendent, were competent, and will be treated by the appellate court as though admitted on the question of value.

SHERWOOD, J.—The evidence incident to the prominent features of this litigation has been set forth with sufficient fullness in the accompanying statement, in order that the controlling facts may be readily apparent; and when thus apparent, the proper conclusions of law arising on those facts will not be difficult.

I.   Upon those facts we determine that there was *no sale* of the twenty shares of stock by the Franklin Bank to defendant, George Wilson. A sale of personal property at common law consisted of the elements of a proper subject, a price and the consent of the contracting parties. *Cunningham v. Ashbrook*, 20 Mo. 553; *Nance v. Metcalf*, 19 Mo. App. 183; 1 Benjamin on Sales [3 Ed.], secs. 2 and 3.

Lacking any one of these constituent elements, of course there could be no sale. There was no mutual assent of the parties in this case, and no price was fixed upon. The transfer of Mrs. Greer's note and the stock which accompanied it, to defendant George Wilson, *under his own order of July 20, 1891, as president,* was but the result of an *arbitrary direction* to that effect, and not the result of a reciprocal agreement between meeting and contracting minds. In consequence of no sale having occurred, the title of the article pledged remained as it was before its attempted transfer.

II. But there is another view to be taken of the facts of this case, and that is this: There can be no doubt that though the time of the payment of Mrs. Greer's note was stated therein to be *three* months, yet the positive testimony of Mr. Greer as to the original transaction shows, and that of Mrs. Greer shows, also, that the time was extended, in fact was not regarded as material, so long as the interest was paid. But the testimony of plaintiff and her husband may be entirely discarded, and still the *acts* of the defendant bank in accepting, without objection, payments of interest from time to time for a period of years, as well as payments in like manner of portions of the principal, are *alone* sufficient to warrant the conclusion that the time for the payment of the principal was extended indefinitely and regarded as immaterial. This long course of dealing between the parties must be regarded as *materially qualifying the terms of the note as regards time of payment;* it ceased to be a note payable at three months and became one payable *on demand.* And where a sale of collaterals occurs, which are held for a loan payable on demand, without notice to, or demand of, the pledgor, it is invalid, and may, at the option of the

latter, be affirmed or treated as a conversion. Colebrooke, Collat. Secur., sec. 121, and cases cited.

In this case, as before noted, there was neither notice nor demand of Mrs. Greer that her note should be paid; in fact she was ignorant it had ever changed hands, and was not informed of the transfer until by the letter of Wilson of date January 6, 1892.

III. Not only must the pledgee, as a general rule, give reasonable notice to the pledgor of his intention to sell, but he is prohibited from buying at the sale made by himself, or whether made by his agent or broker. The result of the purchase in either event is the same. Such a sale is a breach of the contract of pledge, and the pledgor may treat such sale and purchase as a conversion and will be entitled to redeem on payment or tender of the principal debt. Colebrooke on Collat. Secur., sec. 332, and cases cited. 1 Cook on Stock and Stockholders [3 Ed.], sec. 479, and cases cited.

Now, if the sale in this instance, conceding it to be otherwise valid, had been made to the *defendant bank*, no doubt could arise under the authorities that such sale made to the bank by its chosen agent, the Franklin Bank, would have been invalid for reasons already stated.

But the case is not favorably altered for the individual defendant Wilson, for he it was that, as president of the defendant bank, planned the whole scheme, which resulted in this litigation. Discerning the *real actor* through the thin disguises of carefully prepared forms, we shall not allow him to shield himself from liability behind a corporate organization, but shall apply to him the rules already mentioned, such as govern in ordinary cases and similar transactions.

IV. Comment is unnecessary as to the fraudulent aspects of this case as disclosed by the evidence;

a reference to that evidence is all-sufficient. And defendant Wilson being the accredited agent of the defendant bank, the latter would of course be bound by the acts done in the course of his employment, even though of a fraudulent character. Story, Agency [9 Ed.], secs. 139, 453, and cases cited; Whart. Agency, secs. 164, 540.

V. It is contended that there is no evidence in the record showing the value of the stock in question. The evidence shows the whole financial situation of the State National Bank of El Paso; shows the bank to be on a sound basis, and shows also that the stock had been paying an annual dividend of twelve per cent. In our most recent adjudication on this subject, we have held that though there be no evidence of the *market* value of stock, yet that its *actual* value may well be established by showing its dividend earning capacity, just as was done in the case at bar. *Trust, etc., Co. v. Lumber Co.*, 118 Mo. 447.

VI. The second instruction given at plaintiff's instance in all probability is not a correct exposition of the law; but inasmuch as the verdict was the only one the jury, on the evidence, could properly have returned, the error will be held harmless, and the judgment affirmed. *Fitzgerald v. Barker*, 96 Mo. 661; *Keen v. Schnedler*, 92 Mo. 516; *Otto v. Bent*, 48 Mo. 23; *Bushey v. Glenn*, 107 Mo. 331; *Macfarland v. Heim*, 127 Mo. 327; *Brobst v. Brock*, 10 Wall. 519. All concur.